## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHILIP GORDON, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) Case No. 1:20-cv-02941 |
| v. | ) ) **CLASS ACTION COMPLAINT FOR** |
| LEGG MASON, INC., JOSEPH A. SULLIVAN, CAROL ANTHONY DAVIDSON, ROBERT E. ANGELICA, EDWARD P. GARDEN, MICHELLE J. GOLDBERG, STEPHEN C. HOOLEY, JOHN V. MURPHY, NELSON PELTZ, and ALISON A. QUIRK, | ) **VIOLATIONS OF SECTIONS 14(a) AND** ) **20(a) OF THE SECURITIES** ) **EXCHANGE ACT OF 1934** ) ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |

Plaintiff Philip Gordon ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Legg Mason, Inc. ("Legg Mason" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Legg Mason, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Legg Mason and Franklin Resources, Inc. ("Franklin").

2.      On February 17, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand

to receive $50.00 in cash for each share of Legg Mason stock they own (the "Merger Consideration").

3.      On March 27, 2020, in order to convince Legg Mason shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading preliminary proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Legg Mason shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Legg Mason's financial advisors, PJT Partners LP ("PJT Partners") and J.P. Morgan Securities LLC ("J.P. Morgan") in support of their opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Legg Mason shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took

place in this District and the Company's common stock trades on the New York Stock Exchange, which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Legg Mason common stock.

12.     Defendant Legg Mason is incorporated in Maryland and maintains its principal executive offices at 100 International Drive, Baltimore, Maryland 21202.  The Company's common stock trades on the NYSE under the ticker symbol "LM."

13.     Individual Defendant Joseph A. Sullivan is Legg Mason's Chief Executive Officer and Chairman and has been a director of Legg Mason at all relevant times.

14.     Individual Defendant Carol Anthony Davidson is Legg Mason's Lead Independent Director and has been a director of Legg Mason at all relevant times.

15.     Individual Defendant Robert E. Angelica has been a director of Legg Mason at all relevant times.

16.     Individual Defendant Edward P. Garden has been a director of Legg Mason at all relevant times.

17.     Individual Defendant Michelle J. Goldberg has been a director of Legg Mason at all relevant times.

18.     Individual Defendant Stephen C. Hooley has been a director of Legg Mason at all relevant times.

19.     Individual Defendant John V. Murphy has been a director of Legg Mason at all relevant times.

20.     Individual Defendant Nelson Peltz has been a director of Legg Mason at all relevant times.

21.     Individual Defendant Alison A. Quick has been a director of Legg Mason at all relevant times.

22.     The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Legg Mason (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of March 23, 2020, there were approximately88,000,000 shares of Legg Mason common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Legg Mason will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly

comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)      whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.       Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.       Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.       The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.       Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## **SUBSTANTIVE ALLEGATIONS**

**I.    The Proposed Transaction**

25.    Legg Mason is a global asset management firm that operates through nine independent asset management subsidiaries.  Acting through its asset management subsidiaries, the Company provides investment management and related products and services to institutional and individual clients, company -sponsored mutual funds and other investment vehicles.

26.    On February 18, 2020, Legg Mason and Franklin issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

> SAN MATEO, Calif.--(BUSINESS WIRE)--Franklin Resources, Inc. (the "Company") [NYSE:BEN], a global investment management organization operating as Franklin Templeton, today announced that it has entered into a definitive agreement to acquire Legg Mason, Inc. [NYSE:LM] for $50.00 per share of common stock in an all-cash transaction. The Company will also assume approximately $2 billion of Legg Mason's outstanding debt. The acquisition of Legg Mason and its multiple investment affiliates, which collectively manage over $806 billion in assets as of January 31, 2020, will establish Franklin Templeton as one of the world's largest independent, specialized global investment managers with a combined $1.5 trillion in assets under management (AUM) across one of the broadest ranges of high-quality investment teams in the industry. The combined footprint of the organization will significantly deepen Franklin Templeton's presence in key geographies and create an expansive investment platform that is well balanced between institutional and retail client AUM. In addition, the combined platform creates a strong separately managed account business.
>
> "This is a landmark acquisition for our organization that unlocks substantial value and growth opportunities driven by greater scale, diversity and balance across investment strategies, distribution channels and geographies," said Greg Johnson, executive chairman of the Board of Franklin Resources, Inc. "Our complementary strengths will enhance our strategic positioning and long-term growth potential, while also delivering on our goal of creating a more balanced and diversified organization that is competitively positioned to serve more clients in more places."
>
> Jenny Johnson, president and CEO of Franklin Templeton, said, "This acquisition will add differentiated capabilities to our existing investment strategies with modest

overlap across multiple world-class affiliates, investment teams and distribution channels, bringing notable added leadership and strength in core fixed income, active equities and alternatives. We will also expand our multi-asset solutions, a key growth area for the firm amid increasing client demand for comprehensive, outcome-oriented investment solutions."

Joseph A. Sullivan, chairman and CEO of Legg Mason, said, "The incredibly strong fit between our two organizations gives me the utmost confidence that this transaction will create meaningful long-term benefits for our clients and provide our shareholders with a compelling valuation for their investment. By preserving the autonomy of each investment organization, the combination of Legg Mason and Franklin Templeton will quickly leverage our collective strengths, while minimizing the risk of disruption. Our clients will benefit from a shared vision, strong client-focused cultures, distinct investment capabilities and a broad distribution footprint in this powerful combination."

Carol Anthony "John" Davidson, lead independent director of Legg Mason, said, "Today's announcement marks the beginning of an exciting next chapter for Legg Mason, our investment affiliates and valued clients, who will benefit from a leading global asset manager with the scale to compete and win in today's markets. I am honored to have had the opportunity to serve as the lead independent director of this dynamic board, and I am truly appreciative of the hard work and dedication of the entire Legg Mason team."

Nelson Peltz, CEO and Founding Partner of Trian Fund Management, L.P. and a Legg Mason director said, "Given the dynamics of today's rapidly evolving and increasingly competitive asset management sector, I believe this transaction is compelling. In our view, it offers an attractive valuation for Legg Mason's shareholders. I believe it will also enable Legg Mason's investment affiliates to remain at the forefront of an industry where scale is increasingly vital to success and to join Franklin Templeton, an organization that I have deep respect for and confidence in."

Trian Fund Management, L.P. and funds managed by it, which collectively own approximately 4 million shares or 4.5% of the outstanding stock of Legg Mason, have entered into a voting agreement in support of the transaction.

Jenny Johnson added, "This transaction gives us significant scale, addresses strategic gaps and brings greater balance to our business, while positioning us for accelerated growth in the future. We have incredible respect and admiration for the success Legg Mason and its investment affiliates have achieved and we have structured the transaction to ensure that its affiliates have the right mix of independence and support to continue building on their strong track records. Legg Mason's investment affiliates will be able to leverage Franklin Templeton's global infrastructure and ongoing investment in technology and innovation, while clients can take comfort in the combined firm's financial strength and aligned interests."

**Continued Autonomy for Investment Affiliates**

Franklin Templeton has spent significant time with the affiliates and there is strong alignment among all parties in this transaction and shared excitement about the future of the company.

James W. Hirschmann, CEO of Western Asset, a Legg Mason affiliate, said, "Western Asset is excited to be joining the Franklin Templeton family, a firm with a long and storied history of proven financial performance and a leadership team and board with decades of asset management experience who value our investment independence and organizational autonomy. Like us, Franklin Templeton understands the importance of culture, teams and core values to achieving outstanding investment results for clients."

Terrence J. Murphy, CEO of ClearBridge Investments, a Legg Mason affiliate, said, "As part of Franklin Templeton, we are confident that we will retain the strong culture that has defined our success as a recognized market leader in active equities. Their commitment to investment autonomy, augmented by the scale and reach that the combined organization will provide, will allow us to deliver for our existing clients and expand our ability to deliver our investment capabilities in new channels and regions. We are very pleased to join the team at Franklin Templeton and excited about what we can do together."

**Organizational Structure and Parent Company Integration**

With this acquisition, Franklin Templeton will preserve the autonomy of Legg Mason's affiliates, ensuring that their investment philosophies, processes and brands remain unchanged. As with any acquisition, the pending integration of Legg Mason's parent company into Franklin Templeton's, including the global distribution operations at the parent company level, will take time and only commence after careful and deliberate consideration.

Following the closing of the transaction, Jenny Johnson will continue to serve as president and CEO, and Greg Johnson will continue to serve as executive chairman of the Board of Franklin Resources, Inc. There will be no changes to the senior management teams of Legg Mason's investment affiliates. Global headquarters will remain in San Mateo, CA and the combined firm will operate as Franklin Templeton.

After careful consideration, EnTrust Global, a Legg Mason affiliate that provides alternative investment solutions, and Franklin Templeton, jointly agreed that it was in their best interest that EnTrust repurchase its business, which will be acquired by its management at closing. EnTrust will maintain an ongoing relationship with Franklin Templeton. Jenny Johnson added, "EnTrust is an excellent business and we recognize and appreciate their desire to once again become a private company.

We have appreciated their collaboration in our discussions and look forward to our ongoing relationship."

**Transaction Details**

The all-cash consideration of $4.5 billion will be funded from the Company's existing balance sheet cash. Franklin Templeton will also assume approximately $2 billion in Legg Mason's outstanding debt. Upon closing of the transaction, Franklin Templeton expects to maintain a robust balance sheet and considerable financial flexibility with pro forma gross debt of approximately $2.7 billion with remaining cash and investments of approximately $5.3 billion. This transaction is designed to preserve the Company's financial strength and stability with modest leverage, significant liquidity and strong cash flow to provide ongoing flexibility to invest in further growth and innovation.

This transaction is expected to generate upper twenties percentage GAAP EPS accretion in Fiscal 2021 (based on street consensus earnings estimates for each company), excluding one-time charges, non-recurring and acquisition related expenses.

While cost synergies have not been a strategic driver of the transaction, there are opportunities to realize efficiencies through parent company rationalization and global distribution optimization. These are expected to result in approximately $200 million in annual cost savings, net of significant growth investments Franklin Templeton expects to make in the combined business and in addition to Legg Mason's previously announced cost savings. The majority of these savings are expected to be realized within a year, following the close of the transaction, with the remaining synergies being realized over the next one to two years.

The transaction has been unanimously approved by the boards of Franklin Resources, Inc. and Legg Mason, Inc. This transaction is subject to customary closing conditions, including receipt of applicable regulatory approvals and approval by Legg Mason's shareholders, and is expected to close no later than the third calendar quarter of 2020.

Broadhaven Capital Partners, LLC and Morgan Stanley & Co LLC served as financial advisors to Franklin Resources, Inc. Ardea Partners LP also provided advice. Willkie Farr & Gallagher LLP acted as external legal counsel. PJT Partners served as the lead financial advisor to Legg Mason. J.P. Morgan Securities LLC also served as financial advisor to Legg Mason. Weil, Gotshal & Manges LLP served as lead counsel to Legg Mason and Skadden, Arps, Slate, Meagher & Flom LLP served as special counsel to Legg Mason. Dechert LLP served as legal counsel to EnTrust Global.

**Conference Call Information**

Executives from Franklin Templeton and Legg Mason will lead a live teleconference today at 8:30 a.m. Eastern Time. Access to the teleconference will be available by dialing (877) 407-8293 in the U.S. and Canada or (201) 689-8349 internationally, and a supplementary presentation will be available to investors via franklinresources.com. A replay of the teleconference can also be accessed by calling (877) 660-6853 in the U.S. and Canada or (201) 612-7415 internationally, using access code 13699226, after 11:30am ET on February 18, 2020 through March 18, 2020.

**About Legg Mason**

Guided by a mission of Investing to Improve Lives™, Legg Mason helps investors globally achieve better financial outcomes by expanding choice across investment strategies, vehicles and investor access through independent investment managers with diverse expertise in equity, fixed income, alternative and liquidity investments. Legg Mason's investment affiliates operate with investment independence and have specialized expertise across asset classes and markets around the globe. The firm's affiliates include: Brandywine Global, Clarion Partners, ClearBridge Investments, Martin Currie, QS Investors, Royce Investment Partners, and Western Asset. Legg Mason's assets under management are $806 billion as of January 31, 2020.

**About Franklin Templeton**

Franklin Resources, Inc. [NYSE:BEN] is a global investment management organization operating, together with its subsidiaries, as Franklin Templeton. Franklin Templeton's goal is to deliver better outcomes by providing global and domestic investment management to retail, institutional and sovereign wealth clients in over 170 countries. Through specialized teams, the Company has expertise across all asset classes, including equity, fixed income, alternatives and custom multi-asset solutions. The Company's more than 600 investment professionals are supported by its integrated, worldwide team of risk management professionals and global trading desk network. With employees in over 30 countries, the California-based company has more than 70 years of investment experience and approximately $688 billion in assets under management as of January 31, 2020. For more information, please visit investors.franklinresources.com.

27.     Legg Mason is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so

that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.    The Materially Incomplete and Misleading Proxy

29.     On March 27, 2020, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

30.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses that in connection with the Proposed Transaction, the Company prepared "internal financial forecasts relating to the Company . . . for fiscal years 2020 through 2020 that were pro-rated to equivalent calendar years while also

extrapolating to calendar years 2022 through 2024 based on hypothetical assumptions for flows, markets and inflation and operating margin." Proxy 49.

31.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101). Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions. In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K. *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format." 17 C.F.R. § 229.10(b). Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items." 17 C.F.R. § 229.10(b)(2).

33.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights

into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.     Here, Legg Mason's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it and determine that the Proposed Transaction are fair to, and in the best interests of the Company and its shareholders. Proxy 45-47.

35.     As discussed further below, the non-GAAP financial projections used do not provide Legg Mason's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

**The Financial Projections Relied on by the Board**

36.     The Proxy discloses that in connection with the Proposed Transaction, the Company prepared "internal financial forecasts relating to the Company . . . for fiscal years 2020 through 2020 that were pro-rated to equivalent calendar years while also extrapolating to calendar years 2022 through 2024 based on hypothetical assumptions for flows, markets and inflation and operating margin." *Id.* at 49.

37.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020 through 2024 for: (1) Adjusted EBITDA (Post-SBC) and (2) Unlevered Free Cash Flow, but fails to provide (i) the

line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 50.

38.    The Proxy defines Adjusted EBITDA as "a non-GAAP financial measure and is defined as net income, less non-controlling interest, plus tax expense, plus net interest expense, plus depreciation and amortization, plus or minus unrealized gains and losses on investment securities, plus or minus special charges or adjustments." *Id.* at 50 n.1.  Nevertheless, the Proxy fails to reconcile Adjusted EBITDA (Post-SBC) to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA (Post-SBC), rendering the Proxy materially false and/or misleading. *Id.*

39.    The Proxy does not provide a definition for Unlevered Free Cash Flow ("UFCF"). The failure to reconcile UFCF to its most comparable GAAP measure, disclose the line items used to calculate UFCF or even provide a definition renders the Proxy materially false and/or misleading.

40.    Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

41.    The non-GAAP financial projections disclosed on page 50 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial

assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

42.    As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

43.    The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

44.    Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

. . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

45.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Legg Mason included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

---

[4]    SEC, *Final Rule.*

[5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

46.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

47.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into

---

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.     The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited Oct. 28, 2019).

compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

48.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures. Nor can shareholders compare the Company's financial prospects with similarly situated companies.

49.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.  Indeed, Defendants acknowledge that "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures such as those used in the Company Projections may not be comparable to similarly titled amounts used by other companies or persons."  Proxy 51.

50.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

51.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 50, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

52.     The summary of the valuation methodologies utilized by PJT Partners and J.P. Morgan, including the utilization of certain of the non-GAAP financial projections described above by PJT Partners and J.P. Morgan, in connection with their valuation analyses (*id.* at 52, 59)

is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a Proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

53.     With respect to PJT Partners' *Selected Precedent Transaction Analysis*, the Proxy discloses that PJT Partners calculated the stock price of each target company as a multiple of last twelve month earnings per share adjusted to take into account merger-related amortization and the total enterprise value of each target company as a multiple of its last twelve month EBITDA. *Id.* at 54-55. The Proxy fails to disclose the individual multiples calculated for each transaction, or even the summary statistics for the analyzed companies.

54.     With respect to PJT Partners' *Selected Comparable Company Analysis*, the Proxy discloses that PJT Partners calculated the stock price of each selected company as a multiple of 2020 calendar year estimated earnings per share and the total enterprise value of each selected company as a multiple of 2020E EBITDA. *Id.* at 56. The Proxy fails to disclose the individual multiples calculated for each comparable company, or even the summary statistics for the analyzed companies.

55.     With respect to J.P. Morgan's *Public Trading Multiples* analysis, the Proxy discloses that J.P. Morgan calculated the ratio of the selected company's stock price to the consensus equity research analyst estimate for the selected company's earnings per share adjusted to remove the effect of merger-related amortization for the years ending December 31, 2020 and December 31, 2021. *Id.* at 61. The Proxy fails to disclose the individual multiples calculated for each comparable company, or even the summary statistics for the analyzed companies.

56.     With respect to J.P. Morgan's *Selected Transaction Analysis*, the Proxy discloses that J.P. Morgan calculated the ratio of the target company's firm value implied by the transaction to the target company's Adjusted EBITDA for the twelve-month period prior to announcement of the transaction.  *Id.* at 62.  The Proxy fails to disclose the individual multiples calculated for each transaction, or even the summary statistics for the analyzed companies.

57.     Both PJT Partners and J.P. Morgan performed a discounted cash flow analysis on Legg Mason.  With respect to PJT Partners' *Discounted Cash Flow Analysis*, the Proxy states that PJT Partners calculated the estimated enterprise value of the Company by adding the Company's estimated unlevered free cash flows for the period from December 31, 2020 through December 31, 2023 to the range of terminal values as of December 31, 2024.  *Id.* at 56-57.  PJT Partners calculated the terminal value by applying an exit multiple range of 6.5x to 8.5x to the Company's 2024 calendar year estimated EBITDA and applying a perpetuity growth rate range of 0.2% to 0.8% to the Company's 2024 calendar year estimated unlevered free cash flow.  *Id.* at 57.  PJT Partners discounted the estimated enterprise value using a discount rate range of 9.0% to 11.0%, based on the Company's weighted average cost of capital.  *Id.*  PJT Partners then calculated a range of implied equity values per share by adding the Company's cash, subtracting debt, adding the value of the Company's equity investments, and adding the present value of certain net operating losses to the estimated enterprise values and divided the sum by the number of fully diluted shares of the Company outstanding.  *Id.*

58.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy discloses that J.P. Morgan calculated the estimated enterprise value of the Company by using the forecasted unlevered free cash flows that the Company was expected to generate during fiscal year 2020 through 2024, as provided by the Legg Mason management, and added a calculated range of

terminal values calculated by applying perpetuity growth rates ranging from 0.5% to 1.0% to the terminal year unlevered free cash flow. *Id.* at 63. J.P. Morgan discounted the estimated enterprise value by applying a discount rate range of 9.0% to 11.0%, based on the Company's weighted average cost of capital. *Id.* J.P. Morgan also calculated the present value of the tax benefits from the Company's estimated net operating loss carryforwards and other tax benefits as provided by the Company's management using discount rate ranges of 9.0% to 11.0%. *Id.*

59.     With respect to PJT Partners' *Discounted Cash Flow Analysis*, the Proxy fails to disclose the definition of the unlevered free cash flow, the calculated terminal values, the inputs used to calculate the Company's weighted average cost of capital, the Company's cash, the Company's debt, the value of the Company's equity investments, the discount rate used to value the net operating losses or the number of fully diluted shares outstanding.

60.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the calculated terminal values, the inputs used to calculate the Company's weighted average cost of capital, whether any enterprise adjustments were made, the value of the Company's estimated net operating loss carry-forwards and other tax benefits or the number of fully diluted shares outstanding.

61.     Since information was omitted, shareholders are unable to discern the veracity of PJT Partners' or J.P. Morgan's discounted cash flow analyses. Without further disclosure, shareholders are unable to compare PJT Partners' or J.P. Morgan's calculations with the Company's financial projections. The absence of any single piece of the above information renders PJT Partners' and J.P. Morgan's discounted cash flow analyses incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

62.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . ."  *Id*. (footnote omitted).  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

63.     Therefore, in order for Legg Mason shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

64.     In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Legg Mason shareholders.

65.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the

Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

66.    Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

67.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [Proxy] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

69.    As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other

clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

70.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

71.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

74.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not*

*misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

75.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

76.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

77.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

78.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

79.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The

Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

80.    Legg Mason is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

81.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

82.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT III

### (Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act)

83.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

84.    The Individual Defendants acted as controlling persons of Legg Mason within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as directors and/or officers of Legg Mason, and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

85.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing the Proxy.

87.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

88.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 9, 2020

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: *<u>/s/ James M. Wilson, Jr.</u>*
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
   jwilson@faruqilaw.com

*Counsel for Plaintiff*

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Philip Gordon ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Legg Mason, Inc. ("Legg Mason") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Legg Mason securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 6th day of April, 2020.

Philip Gordon

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 10/15/19 | 300 |
| | | |
| | | |